**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

COMMONWEALTH OF PENNSYLVANIA :
DEPARTMENT OF PUBLIC WELFARE, :
: **Civil Action No. 1:08-CV-791**
    **Plaintiff,** :
: **(Chief Judge Kane)**
    **v.** :
:
U.S. DEPARTMENT OF HEALTH AND :
HUMAN SERVICES, et al., :
:
    **Defendants** :

## MEMORANDUM

Before the Court are cross-motions for summary judgment filed by Plaintiff

Commonwealth of Pennsylvania Department of Public Welfare ("Pennsylvania" or "the

Commonwealth") and Defendants United States Department of Health and Human Services

("HHS") and Kathleen Sebelius, HHS Secretary.[1]  Pennsylvania challenges an administrative

decision by the HHS Departmental Appeals Board ("DAB") upholding the HHS Secretary's

decision to disallow certain costs paid to Pennsylvania by the federal government.  In particular,

the parties dispute whether a portion of the cost that Pennsylvania incurs in operating community

residential facilities for the developmentally disabled is properly included in the cost of

providing waiver services, which is reimbursable under Medicaid, or whether all "occupancy

costs" for the facilities are barred by the statutory exclusion of "room and board" costs for

community residential facilities.

After careful review of the administrative record and consideration of the briefs and oral

---

[1] Kathleen Sebelius is substituted for her predecessor, Michael O. Leavitt, as HHS
Secretary pursuant to Federal Rule of Civil Procedure 25(d).

argument of the parties, together with the applicable law, the Court finds that the DAB's decision that the costs at issue were barred by the "room and board" exclusion was not arbitrary or capricious. Therefore, the Court will affirm the DAB's decision and grant summary judgment in favor of Defendants.

## I. BACKGROUND

Medicaid provides "joint federal and state funding of medical care for individuals who cannot afford to pay their own medical costs." Arkansas Dep't of Health and Human Servs. v. Ahlborn, 547 U.S. 268, 275 (2006). It was enacted in 1965 as Title XIX of the Social Security Act, as added, 79 Stat. 343, 42 U.S.C. § 1396 et seq. (2000 ed. and Supp. III). Id. States are not required to participate in Medicaid, yet all do. Id. "The program is a cooperative one; the Federal Government pays between 50% and 83% of the costs the State incurs for patient care, and, in return, the State pays its portion of the costs and complies with certain statutory requirements for making eligibility determinations, collecting and maintaining information, and administering the program." Id. (citing 42 U.S.C. § 1396a); see also Children's Seashore House v. Waldman, 197 F.3d 654, 655-56 (3d Cir. 1999).[2] Medicaid is administered by the HHS Secretary, who in turn has delegated her authority to regional Centers for Medicare and Medicaid Services ("CMS"). Ahlborn, 547 U.S. at 275.

Since its inception in 1965, Medicaid has allowed States to receive federal financial participation ("FFP") for the cost of medical assistance provided to eligible individuals in intermediate care facilities for the mentally retarded ("ICF/MRs"). (Doc. No. 22 at 5.) In 1981,

---

[2] The rate of federal financial participation in Pennsylvania's Medicaid program is approximately 54%. (Doc. No. 22 at 4.)

Medicaid began providing funding for state-run home and community-based care through a waiver program, which is referred to as the home and community-based services waiver ("HCBS waiver"). (See Doc. No. 26 at 3); Olmstead v. L.C., 527 U.S. 581, 601 (1999). "The waiver program provides Medicaid reimbursement to States for the provision of community-based services to individuals who would otherwise require institutional care, upon a showing that the average annual cost of such services is not more than the annual cost of institutional services." Olmstead, 527 U.S. at 601 n.12 (citing 42 U.S.C. § 1396n(c)).[3]

The HCBS waiver allows for Medicaid to reimburse a State's "habilitation services" in community residential facilities. Such habilitation services are defined by statute as ones "designed to assist individuals in acquiring, retaining, and improving the self-help, socialization, and adaptive skills necessary to reside successfully in home and community based settings . . . ." 42 U.S.C. § 1396n(c)(5)(A); see also 42 U.S.C. § 1396n(c)(4)(B); 42 C.F.R. § 440.180(b). Although Medicaid allows for habilitation services within residential facilities to be reimbursed, federal reimbursement for the cost of "room and board" has been explicitly precluded. See 42

---

[3]   The HCBS waiver provision, 42 U.S.C. § 1396n(c), states in pertinent part:

>        The Secretary may by waiver provide that a State plan approved under this subchapter may include as "medical assistance" under such plan payment for part or all of the cost of home or community-based services (other than room and board) approved by the Secretary which are provided pursuant to a written plan of care to individuals with respect to whom there has been a determination that but for the provision of such services the individuals would require the level of care provided in a hospital or a nursing facility or intermediate care facility for the mentally retarded the cost of which could be reimbursed under the State plan. . . .

42 U.S.C. § 1396n(c)(1).

U.S.C. § 1396n(c)(1); see also H.R. Rep. No. 97-208, at 965-68 (1981) (Conf. Rep.), reprinted in 1981 U.S.C.C.A.N. 1010, 1327-30.

During the period at issue in this case, the Commonwealth had two HCBS waivers in effect which allowed it to receive FFP toward "community habilitation services" for individuals who are developmentally disabled and who otherwise would be eligible for care in an ICF/MR.[4] (Doc. No. 22 at 13; Doc. No. 26 at 8-10.)  The initial waiver, effective from July 1, 2000, through June 30, 2005, defined such habilitation services consistent with 42 U.S.C. § 1396n(c)(5)(A). (See Doc. No. 26 at 9-11.)  The agreement stated that "provider training costs, supervisory costs, purchased personnel costs, and costs of necessary supplies, equipment, and adaptive appliances" were included, yet specifically stated that FFP was not available for the cost of room and board. (Id. at 10-11.)  The waiver also included a provision requiring Pennsylvania to make formal requests for any amendment to the waiver.[5]   In December 2006, Pennsylvania secured a five-year renewal of the waiver on terms similar to the 2000 agreement.

───────────────

[4] Altogether, Pennsylvania's Department of Public Welfare's Office of Developmental Programs supports four different types of care for individuals with developmental disabilities: ICF/MRs, community residential facilities, family living homes, and supported independent living arrangements. (Doc. No. 22 at 12-13.)

[5] Specifically, the July 1, 2000 waiver provided in pertinent part:

> The State affirms that it will abide by all terms and conditions set forth in the waiver (including Appendices and attachments), and certifies that any modifications to the waiver request will be submitted in writing by the State Medicaid agency.  Upon approval by HCFA, this waiver request will serve as the State's authority to provide home and community services to the target group under its Medicaid plan.  Any proposed changes to the approved waiver will be formally requested by the State in the form of waiver amendments.

(Doc. No. 26 at 8.)

(See DAB Op. at 8-9.)[6]

As Pennsylvania has explained in its brief, "most residents of the community residential facilities . . . receiv[e] services for the great bulk of their waking hours." (Doc. No. 22 at 14.) The HCBS waiver contemplates such extensive service, as Pennsylvania's waiver agreement states that its habilitation services are to be "provided for 24 hours a day based on the need of the individual receiving services." (Id.) Because habilitation services are offered on-site to individuals, "almost every room in the community residential facility has multiple purposes and uses." (Id. at 15.) For example, "[s]taff use the kitchen not only to prepare food, but also to provide habilitation services to individuals who are learning to become more independent by preparing simple meals and caring for kitchen equipment." (Id. at 15-16.) Likewise, the facility bedrooms and bathrooms are used for resting and bathing, but also as a place for staff to teach daily living activities such as good personal hygiene and grooming. (Id. at 16.)

From July 2001 until the spring of 2006, Pennsylvania did not request Medicaid funding for any facility costs for habilitation services provided to individuals in the community residential facilities. (DAB Op. at 5.) In late 2005, Pennsylvania sought to "recomputate its claims for FFP for its community residential facilities" by including a "portion of occupancy costs associated with provision of [habilitation] services (as opposed to room and board)."[7] (Doc. No. 22 at 18.) To that end, Pennsylvania engaged MAXIMUS, a consulting firm which helped to develop a formula to "determin[e] the portion of the occupancy costs that should be allocated

---

[6] A copy of the DAB's opinion, DAB Decision No. 2152, can be found as Document 3 on the Court's docket sheet.

[7] The Court notes that it will use the terms "occupancy costs" and "facility costs" interchangeably to refer to the costs at issue in this case.

to provision of waiver services, as opposed to sleeping, eating, or other activities of daily living."

(Id.)  Pursuant to the advice from MAXIMUS,

> . . . Pennsylvania officials chose an allocation method . . . which was based on an estimate that residents of the community facilities were, on average in a typical 24-hour period, sleeping for 8 hours, engaged in "habilitative activities or other waiver activities" for 13 hours, and eating or otherwise engaged in activities of daily living that do not involve receiving services for 3 hours. . . . [A]ccording to Pennsylvania, many of the habilitation services are provided while residents are engaged in activities of daily living, such as bathing, dressing, grooming, preparing food, eating, taking medications, and taking part in other activities.  Pennsylvania nevertheless chose to treat most of this time as habilitation services time rather than daily living activities time.
>
> Based on this estimate, Pennsylvania allocated 54.1667% (or 13/24) of most categories of its occupancy costs (including rent, utilities, interest, depreciation, insurance, housekeeping, building repairs and renovations, furnishings and equipment) to "waiver services" or "habilitation services."

(DAB Op. at 6-7 (internal citations omitted).)

In early 2006, Pennsylvania informed CMS of the new allocation plan that it had adopted for the facility costs relating to habilitation services in its community residential facilities. (Doc. No. 22 at 20.)  In August 2006, Pennsylvania filed its first claim with CMS using the new allocation approach. (Id.) On June 21, 2007, CMS disallowed Pennsylvania's claims for reimbursement for the portion of facility costs. (Id.)  In its rejection letter, CMS asserted that the newly allocated claims were for room and board and that Pennsylvania was required to seek an amendment to its HCBS waiver before attempting to reallocate its facility costs. (Id.)

On July 19, 2007, Pennsylvania filed a notice of appeal with the DAB based on CMS's

disallowance.[8] (Id.)  On February 6, 2008, the DAB issued a decision in which it upheld the

position taken by CMS. (Doc. No. 22 at 21.)  In it, the DAB recognized that "Congress excluded

room and board costs from Medicaid reimbursement for HCBS services," and therefore

Pennsylvania's attempt to seek reimbursement for a portion of its occupancy costs must fail.

(DAB Op. at 2.)

    This case appears before the Court as an appeal from the final determination made by the

DAB.  Pennsylvania filed suit on April 28, 2008, and is seeking declaratory and injunctive relief

reversing the decision of the DAB. (Doc. No. 22 at 3.)

## II.    STANDARD OF REVIEW

    This Court's standard of review of Pennsylvania's challenge is governed by the

Administrative Procedure Act ("APA"), 5 U.S.C. § 706 (2000). Robert Wood Johnson Univ.

Hosp. v. Thompson, 297 F.3d 273, 280 (3d Cir. 2002).  Pursuant to the APA, a reviewing court

shall set aside agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not

in accordance with law.'" Chao v. Roy's Constr., Inc., 517 F.3d 180, 186 (3d Cir. 2008).  "The

scope of judicial review of agency rulemaking under the APA's 'arbitrary and capricious'

standard is 'narrow, and a court is not to substitute its judgment for that of the agency.'" Gardner

v. Grandolsky, 585 F.3d 786, 790 (3d Cir. 2009) (citation omitted); see also Albert Einstein

Med. Ctr. v. Sebelius, 566 F.3d 368, 373 (3d Cir. 2009).  Even where a reviewing court "'may

---

[8]    Pennsylvania subsequently appealed for a disallowance covering the period from April 1, 2007, through June 30, 2007, and it was consolidated with its initial appeal. (Doc. No. 22 at 20.)
    The DAB is the independent office established in the Office of the HHS Secretary.  The DAB has been delegated authority to review and decide certain disputes between recipients of HHS funds and HHS awarding agencies. 45 C.F.R. § 74.2. The Board issues decisions in panels of three. See 45 C.F.R. §§ 16.5, 160.502.

not supply a reasoned basis for the agency's action that the agency itself has not given,' it may nevertheless 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" Gardner, 585 F.3d at 790 (citation omitted). This "broad deference is particularly appropriate in contexts that involve a complex and highly technical regulatory program," such as Medicaid. See Albert Einstein Med. Ctr., 566 F.3d at 373 (citation and internal quotation marks omitted). "A court may conclude that a regulation is arbitrary and capricious only if the agency relied on facts other than those intended by Congress, did not consider an important aspect of the issue confronting the agency, provided an explanation for its decision which runs counter to the evidence before the agency, or is entirely implausible." Gardner, 585 F.3d at 790 (citation and internal quotation marks omitted). "Reversal is appropriate only where the administrative action is irrational or not based on relevant factors." NVE, Inc. v. Dep't of Health and Human Servs., 436 F.3d 182, 190 (3d Cir. 2006) (citation omitted).

In giving deference to the DAB's opinion, the Court must follow the rule set forth in Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984). Under Chevron, the appropriate level of deference owed to the HHS Secretary's interpretation of a statute "depends on the clarity of a statute." Commonwealth of Pa., Dep't of Pub. Welfare v. United States Dep't of Health and Human Servs., 928 F.2d 1378, 1383-84 (3d Cir. 1991). Where Congress's intent is clear, "no deference is owed an agency's inconsistent interpretation because both the agency and the reviewing court must 'give effect to the unambiguously expressed intent of Congress.'" Id. at 1384 (quoting Chevron, 467 U.S. at 842-43) (further citations omitted). However, where a statute is ambiguous or is silent on the specific issue, "a reviewing court must uphold the agency's regulation as long as the regulation is reasonable and

is based on a permissible interpretation of the statute." Id. (citations omitted); see also

Commonwealth of Pa. v. United States, 752 F.2d 795, 798 (3d Cir. 1984) (stating that when

statutory language "fairly admits of several interpretations, a reviewing court must uphold the

agency's interpretation if it is reasonable, notwithstanding the court's belief that some other

policy was preferable").[9]

## III.     DISCUSSION

Three separate arguments serve as the basis of Pennsylvania's brief in support of its

motion for summary judgment.  First, the parties dispute whether the DAB acted in an arbitrary

and capricious manner in finding that the facility costs that Pennsylvania sought to add to its

allocation plan included "room and board" costs which were non-reimbursable.  Second, if the

facility costs at issue were not all "room and board" costs, Pennsylvania asserts that the DAB

erred in holding that a portion of these occupancy costs could not be appropriately allocated out

under its HCBS waiver.  Finally, the parties dispute whether Pennsylvania should have been

required to seek an amendment to its waiver and the extent that the DAB should have been

allowed to rely on Pennsylvania's failure to do so.

### A.     Whether All Facility Costs Qualified as "Room and Board"

Pennsylvania concedes that the costs at issue in this case are those "associated with

occupying and operating the community residential facilities.  This includes costs such as rent,

utilities, building insurance, and furnishings." (Doc. No. 22 at 16.)  Thus, the relevant costs are

---

[9] The Social Security Act provides that the "Board's decision . . . shall be the final
decision of the Secretary . . . ." 42 U.S.C. § 1316(e)(2)(B).  The APA "requires that a court
uphold agency policies, including those pronounced in adjudications . . . , unless they are
'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Butler
County Mem'l Hosp. v. Heckler, 780 F.2d 352, 355 (3d Cir. 1985) (citations omitted).

not for the services which are provided within the facility, but rather the cost relating to the facilities themselves. As such, the costs at issue here are "joint costs that benefit the objective of providing room and board to the residents, as well as the objective of providing habilitation services." (DAB Op. at 1-2.) Pennsylvania's first main challenge is that the DAB brushed aside its efforts to segregate costs of "room and board" and instead merely concluded that "the occupancy costs Pennsylvania claimed are all 'room costs.'" (Doc. No. 22 at 25.) According to Pennsylvania, "the Board simply assumed the conclusion, avoiding the question of how occupancy costs incurred in connection with provision of waiver services should be treated under the statute and regulations." (Id.)

The HCBS waiver statute explicitly disallows funding for "room and board" services. See 42 U.S.C. § 1396n(c). What qualifies as "room and board" is not defined in the Social Security Act. CMS has defined the term in its State Medicaid Manual, which provides in pertinent part:

> Board means three meals a day or any other full nutritional regimen. Room means hotel or shelter type expenses including all property related costs such as rental or purchase of real estate and furnishings, maintenance, utilities, and related administrative services.

(CMS, State Medicaid Manual, § 4442.3.B.12; Admin. R. 314); see also 42 C.F.R. 441.310(a)(2)(ii) (defining "board" as "3 meals a day or any other full nutritional regimen"). In its analysis, the DAB noted that Pennsylvania's newly allocated "occupancy" costs had previously been treated as "room" costs. (DAB Op. at 9.) To the DAB, these costs had the "same component parts: rent, utilities, interest, depreciation, building insurance, housekeeping, building repairs and maintenance, building renovations, furnishings and equipment, and repairs of furnishings and equipment." (Id.) As a result, the DAB concluded that "[f]or all intents and purposes, Pennsylvania's occupancy costs in community residential facilities are room costs[.]"

(Id. at 9-10.)  These were differentiated from "habilitation services" costs, which included "provider training costs, supervisory costs, purchased personnel costs, and costs of necessary supplies." (Id. at 10.)

The Court must determine whether it was arbitrary or capricious for the DAB to find that all occupancy costs fit within the statutory exclusion against "room and board."  Under Chevron, the Court must first ask "'whether Congress has directly spoken to the precise question at issue'" because if it has, the Court "'must give effect to the unambiguously expressed intent of Congress.'"  Vineland Fireworks Co. v. Bureau of Alcohol, Tobacco, Firearms & Explosives, 544 F.3d 509, 517 n.12 (3d Cir. 2008) (quoting Chevron, 467 U.S. at 842-43).  "However, statutory silence does not prove that a term is ambiguous." United States v. Geiser, 527 F.3d 288, 294 (3d Cir. 2008) (citation omitted).  Instead, to determine a statute's plain meaning, a Court's "starting point is 'the ordinary meaning of the words used.'" Id. (citation omitted). A court should "refer to standard reference works such as legal and general dictionaries in order to ascertain the ordinary meaning of words." Id.

In this case, the statute does not provide a definition for the term "room and board." Thus, the Court turns to the ordinary meaning of the phrase. See Geiser, 527 F.3d at 294.  The parties both suggest that the meaning of the phrase "room and board" is unambiguous, yet the parties interpret the phrase differently.  Pennsylvania states that "[i]n the context of the phrase 'room and board,' 'room' signifies space for sleeping or shelter, not space in which habilitation services are provided to an individual." (Doc. No. 27 at 3.)  As support, Pennsylvania cites to a Webster's Dictionary definition of "room and board" as "sleeping accommodations and meals." (Id. (citing Webster's New World Dictionary of the American Language 1235 (2d college ed.

1982)).)  Thus, Pennsylvania's interpretation is limited, allowing only for overnight shelter and three meals during the day.  In comparison, HHS looks to a definition of "room and board" as "lodging and meals," and points out that "lodging" is defined as "accommodation in a house, esp. in rooms for rent." (Doc. No. 26 at 23-24 (citing Random House Dictionary (1987); Am. Heritage Dictionary (2006)).)  In this way, HHS argues that "room and board" is to be read more comprehensively, allowing for shelter not only for sleep, but also as a living space during the day. (See Doc. No. 26 at 23-25); see also Merriam-Webster's Collegiate Dictionary 685, 1017 (10th ed. 1997) (defining "room and board" as "lodging and food usually furnished for a set price or as part of wages" and "lodging" as "a place to live," "sleeping accommodations," "a temporary place to stay," and "a room in the house of another used as a residence").

        The Court finds that, in looking at the ordinary meaning of the phrase "room and board," the phrase unambiguously means the provision of living space and meals.  The definition put forward by Pennsylvania is too constrictive to be the "ordinary meaning of the word."  The Court agrees with HHS that the concept of providing room and board to an individual ordinarily means that a person will be afforded living space for her use throughout an entire day, not just for eleven hours of the day where provision is made for overnight shelter and eating.  For example, in the collegiate context, a student pays "room and board" as part of her college expenses, expecting that she will have a room to treat as her home–not merely as a space where she sleeps and eats. See, e.g., Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College, 128 F.3d 59, 61 (2d Cir. 1997) (noting college's "room and board" policy that required first-year students to live in college-owned housing and to participate in a college-run meal plan).  Likewise, in a hotel, a customer paying "room and board" would reasonably expect that she will

be allowed access to her room for living during the length of her stay.

The Court notes that even if the phrase "room and board" were ambiguous, the Court would still affirm the decision of the DAB under the second prong of the <u>Chevron</u> analysis. According to <u>Chevron</u>, if a "statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." 467 U.S. at 842-43; <u>see also</u> <u>Township of Tinicum v. United States Dep't of Transp.</u>, 582 F.3d 482, 485 (3d Cir. 2009). The Court finds that, at the very least, the DAB's interpretation of the extent of the "room and board" exclusion was reasonable.

With this analysis in place, the Court will turn to address the three separate arguments raised by Pennsylvania to challenge DAB's characterization that all costs at issue were "room" costs.

### i. Practicality of Providing Habilitation Services in Residential Facilities

First, Pennsylvania argues a very practical point: If it is able to receive an allocation toward "occupancy costs" for habilitation services in the already existing community residential facilities, it will avoid incurring an additional cost of using an outside facility to provide habilitation services. (Doc. No. 22 at 27.)[10] Pennsylvania avers that it should be reimbursed as if it provided habilitation services at another facility apart from the residential facility: "Plainly a

---

[10] Pennsylvania notes that the Board's reliance on the fact that it did not claim FFP for any occupancy costs before 2006 is misplaced, because "[o]nce Pennsylvania officials determined that some of the occupancy costs should be attributed to provision of Medicaid services in the community residential facilities, [Pennsylvania] performed an allocation to segregate those costs." (Doc. No. 22 at 28.) The Court agrees that Pennsylvania's failure to previously allocate out facility costs is not definitive proof that such an allocation was not allowed. However, in reviewing the decision of the DAB, the Court does not find the DAB's use of this fact in its analysis is sufficient to render its decision arbitrary or capricious.

portion of the occupancy costs is essential to, and attributable to, provision of services, not mere

'room and board.' The Board's decision disregards the reality that occupancy costs are part of

the cost of delivering services." (Id.)

While the Court finds this argument to be beneficial from a policy perspective, it does not

prevail legally. Although a gamut of goods and services are reimbursable under HCBS waivers,

Congress has explicitly disallowed providing reimbursement for "room and board" in

community residential facilities. It is not for the Court to question the wisdom of such a

legislative decision. Therefore, Pennsylvania's argument that the DAB's decision was arbitrary

or capricious fails on this point.[11]

### ii.      Consistency with Waiver Statute

Second, Pennsylvania argues that reimbursement of a portion of the occupancy costs as

part of the cost of providing waiver services is consistent with the waiver statute, 42 U.S.C. §

1396n. (Doc. No. 22 at 29.) Pennsylvania states:

> The statute does not define the term "room and board" nor does the
> legislative history specify Congress's intent. . . . [However,] [t]he
> language and structure of the statute . . . do give some insight into
> what Congress intended. First, it is significant that Congress chose
> the more limited term "room" rather than a broader term such as
> "occupancy costs," "facility costs," or "property-related costs."
> While "room and board" certainly refers to basic shelter and meals,
> on its face the term does not connote space used to provide
> habilitation services throughout the day.
>
> Had Congress meant to exclude from federal reimbursement all
> occupancy costs, even those associated with the provision of services,
> it could have explicitly stated that no property-related costs could be

---

[11] To the extent that Pennsylvania's argument is that the DAB should have allowed for
Pennsylvania to allocate out those costs for habilitation services, the Court will address that
argument in Part III.B *infra*.

> reimbursed.  Or, it could have referred broadly to "facility costs" or
> "occupancy costs."  But Congress did not use any of these broader
> terms.  It is a reasonable inference from the statutory language that
> Congress did not mean to exclude FFP for all occupancy costs, but
> only the more limited portion of costs tied directly to basic shelter.

(Id. at 29-30.)  As support for its reading, Pennsylvania points to the treatment under Medicaid

by HHS of nursing and intermediate care facilities, where "occupancy costs form part of the

rates that qualify for federal reimbursement." (Id. at 30.)  Pennsylvania argues that it is a

reasonable conclusion that Congress "intended to exclude reimbursement only for costs specific

to room and board, not other occupancy costs associated with use of the facilities to provide

services." (Id. at 31.)  Pennsylvania also argues that reading the "room and board" exclusion too

broadly would be inconsistent with the purpose of the HCBS waiver, which was to "encourage

States to move developmentally disabled individuals from institutions into their communities

while maintaining the level of services available to these individuals." (Id. at 31-32.)

    To show that the DAB's decision was arbitrary or capricious, Pennsylvania must show

that the "administrative action is irrational or not based on relevant factors." NVE, Inc., 436 F.3d

at 190 (citation omitted).  To overcome the "broad deference" given to HHS's interpretation of

Medicaid, see Albert Einstein, 566 F.3d at 373, the DAB's reading of the statute must be shown

to be "entirely implausible." Gardner, 585 F.3d at 790.  In the present case, Pennsylvania points

out that an allocation to the residential facility for habilitation services is a reasonable inference

from the text of the statute.  However, that does not mean that it is the only reasonable inference

or that the reading chosen by the DAB was unreasonable.  Indeed, as HHS argues, the evidence

presented by Pennsylvania regarding the reimbursement of nursing and intermediate care

facilities reasonably cuts the other way because those types of facilities do not derive their

reimbursements from the HCBS waiver statute at issue in this case. (See Doc. No. 29 at 6-7.) Therefore, the Court agrees that the decisions relied on by Pennsylvania are not binding because "none of them involve the HCBS waiver program or the specific statutory exclusion of room and board found in [§ 1396n(c)(1)]." (Id. at 6.)

As further support of congressional intent, Pennsylvania points to the "caregiver exception" in § 1396n, which allows for the room and board costs of a live-in caregiver to be included in the costs of medical assistance when a developmentally disabled individual receives services in her home. See 42 U.S.C. § 1396n(c)(1).[12]  According to Pennsylvania, this provision "demonstrates that Congress intended the full costs of services to be reimbursable, even when the individual is living in his or her own home and receiving services there." (Doc. No. 22 at 32-33.)  Pennsylvania argues that since Congress has chosen to cover occupancy costs "related to services provided in a recipient's home, it could have hardly intended to exclude reimbursement for occupancy costs related to services" provided in the community residential facilities. (Id. at 33.)

In addressing Pennsylvania's use of the "caregiver exception," the Court agrees with HHS that the exception cuts the other way: "[T]he fact that Congress explicitly prohibited

---

[12] Specifically, the statute states in pertinent part:

> For purposes of this subsection, the term "room and board" shall not include an amount established under a method determined by the State to reflect the portion of costs of rent and food attributable to an unrelated personal caregiver who is residing in the same household with an individual who, but for the assistance of such caregiver, would require admission to a hospital, nursing facility, or intermediate care facility for the mentally retarded.

42 U.S.C. § 1396n(c)(1).

federal participation in room and board costs, except for the room and board costs of an unrelated personal caregiver, provides a strong indication that no other exceptions were intended." (Doc. No. 29 at 11-12 (citing TRW Inc. v. Andrews, 534 U.S. 19, 28 (2001)).) Indeed, if Congress intended for such an exception to apply to the facility costs at issue in this case, it could have explicitly stated so in a separate exception. The Court is unconvinced by Pennsylvania's argument that HHS's failure to provide reimbursement for occupancy costs was inconsistent with the waiver statute. Therefore, the Court finds that Pennsylvania has failed to demonstrate that the DAB's decision was arbitrary or capricious.

### iii. State Medicaid Manual

Third, Pennsylvania points to the State Medicaid Manual as evidence that Congress did not intend the "room and board" exclusion to refer to all occupancy-related costs. (Doc. No. 22 at 33.) According to Pennsylvania, the Manual "contemplates that occupancy costs will be part of the cost of services in residential facilities and that such costs are eligible for Medicaid reimbursement." (Id.) Pennsylvania cites to Section 4442.3 of the Manual, which provides:

> FFP is not available to facilities providing services in residential settings on days when waiver recipients are temporarily absent . . . . Medicaid payment may be made only for waiver services actually provided to an eligible recipient. Since providers incur fixed costs such as rent, staff salaries, insurance, etc., even when a waiver recipient is temporarily absent, [a State Medicaid agency] may account for such continuing costs when developing payment rates for these providers.

(State Medicaid Manual § 4442.3.B.15; Admin. R. 316-17 (emphasis added).) Pennsylvania argues that "on its face [this provision] assumes that rent, insurance, and other fixed costs are incurred in connection with providing waiver services and are therefore reimbursable under Medicaid," and that the DAB acted arbitrarily by minimizing its significance and finding it

ambiguous. (Doc. No. 22 at 34.)  At a minimum, Pennsylvania argues, the Board should have

"explain[ed] the meaning and application of this CMS regulation to Pennsylvania's claim for

FFP."[13]  (Id.)  In its reply brief, Pennsylvania argues further that the reading of § 4442.3.B.15 was

unreasonably limited by the DAB. (See Doc. No. 27 at 8.)

In response, HHS points out that "the Board did not disregard State Medicaid Manual §

4442.3.B.15.  Rather, the Board determined that this particular provision did not establish that

the costs for which Plaintiff sought reimbursement were permissible." (Doc. No. 29 at 10.)

Specifically, the Board held:

> Even if section 4442.3.B.15 applies to a state setting rates for HCBS
> waiver services provided in a residential setting . . . it is at best
> ambiguous with respect to what rent may be claimed.  Its final
> sentence refers back to the provider's total <u>allowable</u> costs.  As we
> have explained above, the federal statute and regulation establish that
> room and board costs are not allowable.  Thus, any policy that
> permits allocation of some occupancy costs such as rent as a cost of
> habilitation or other services provided in community residential
> facilities clearly would not apply if those costs are also costs of room
> and board.

(DAB Op. at 16 (emphasis in original).)  The Court finds that the Board's explanation is not

implausible, nor does it run counter to the evidence before the Board.  Therefore, this aspect of

the DAB's decision was not arbitrary or capricious and will be upheld.

**B.      Apportionment of Occupancy Costs**

---

[13] Pennsylvania also challenges the DAB's citation to State Medicaid Manual §
4442.3.B.12 as support for the Board's "conclusion that Pennsylvania could not obtain FPP for
any property-related costs." (Doc. No. 22 at 34; see also Doc. No. 27 at 7.)  Pennsylvania
challenges DAB's interpretation of the regulation by making largely the same arguments that it
made regarding DAB's interpretation of the phrase "room and board."  After reviewing these
arguments, the Court finds that Pennsylvania has failed to show that the Board's reading of §
4442.3.B.12 was arbitrary or capricious.

Pennsylvania's second main challenge to the DAB's decision is that "by classifying all the costs at issue as 'room' costs, [the DAB] failed to give serious consideration to whether Pennsylvania could reasonably allocate a portion of occupancy costs to waiver services for the community residential facilities." (Doc. No. 22 at 36.) Pennsylvania argues that the DAB erred by concluding that no allocation could be given where the facilities were used in part for room and board because, in doing so, the Board failed to recognize that "federal reimbursement principles authorize States to allocate costs among benefitting programs . . . ." (Id.)

Contrary to Pennsylvania's characterization of its opinion, the DAB did recognize that the facility space at issue was to have a dual purpose "both as living space for the residents and as a site for providing the residents with habilitation services." (DAB Op. at 10 (emphasis in original).) In its reading of OMB Circular A-87,[14] the DAB held that "[i]f a cost is a type of cost subject to a limit or exclusion under the federal statute governing the program, then it is not allowable even if the cost is allocable to a cost objective under that program." (Id. at 11.) Therefore, since all of the costs were allocable to the cost objective of room and board, which is specifically excluded from reimbursement by federal statute, any reimbursement–even for the generally allowable costs relating to habilitation services–is unallowable. (See id. at 11-12.) The DAB concluded that

> although the OMB Circular provides instructions for allocating

---

[14] "Since 1988, HHS has incorporated by reference OMB Circular A-87 in its own regulations and guidance documents." Arizona v. Thompson, 281 F.3d 248, 251 (C.A.D.C. 2002) (citing 45 C.F.R. § 92.22; 45 C.F.R. § 74.27). OMB Circular A-87 is promulgated by the Office of Management and Budget which "issue[s] government-wide standards concerning the allocation of the costs of government programs." Thompson, 281 F.3d at 251. OMB Circular A-87 has the force of a regulation. State of New York v. Shalala, 979 F. Supp. 177, 179 (S.D.N.Y. 1997).

> allowable costs among two or more cost objectives, <u>it cannot and does not override specific federal law that prohibits the reimbursement of certain types of costs</u>. . . . Under the HCBS waiver program, room and board costs are not allowable because the statute and regulation specifically preclude federal funding for such costs . . . . Applying the allocation method Pennsylvania used here clearly resulted in allocating to Medicaid costs that simply are not allowable under that program. Thus, the fact that the method used might, in some circumstances, be a reasonable method of allocating joint costs among benefitting activities is irrelevant here.

(DAB Op. at 12 (second emphasis added).) Pennsylvania raises three different arguments against the analysis done by the DAB. In addition to addressing each of these arguments, the Court will address an argument raised in Pennsylvania's response brief regarding the level of deference the DAB decision should be given.

### i.    Federal Practice Regarding Joint Costs

Pennsylvania first argues that the DAB's decision that the occupancy costs may not be reimbursed is at odds with standard practice of allocating costs in federal benefit programs. (Doc. No. 22 at 36.) Pointing to the DAB's treatment of OMB Circular A-87, Pennsylvania argues that the Board "fail[ed] to address whether the portion of occupancy costs related to the provision of services, an allowable cost, is properly reimbursed [where] room and board costs have been properly segregated and removed from the FFP claim." (<u>Id.</u> at 37-38.)

As noted above, however, the DAB did address whether the facility costs could be segregated. The DAB noted that the facilities at issue were used to provide space for living and for habilitation services. (DAB Op. at 10.) Likewise, the DAB recognized that joint costs might, in some circumstances, be allocated out using the method devised by MAXIMUS and adopted by Pennsylvania. (<u>See id.</u> at 12.) The DAB simply disagreed with Pennsylvania that this was such a case. Instead, the DAB held that because the entire cost could be allocated to the cost

objective of room and board, allocation was not allowed.

Pennsylvania also points to the DAB's reference to direct and indirect costs in OMB Circular A-87 and argues that the DAB misconstrued the meaning of the provision relating to such costs. (Doc. No. 22 at 38; see DAB Op. at 12 (citing OMB Circular A-87, App. E., ¶¶ A.1, C.2.b ("Both the direct costs and the indirect costs shall exclude capital expenditures and unallowable costs.")).) However, Pennsylvania misreads the import of the DAB's citation to direct and indirect costs. The Board's use of that reference demonstrated that OMB Circular A-87 ordinarily "provide[s] instructions for allocating allowable costs among two or more cost objectives . . . ." (DAB Op. at 12 (emphasis removed).) Yet the DAB held that this general principle "cannot and does not override specific federal law that prohibits the reimbursement of certain types of costs." (Id.) In line with its holding, the DAB looked to the "Purpose and Scope" section of OMB Circular A-87, which requires that the regulations be "designed to provide that Federal awards bear their fair share of the costs recognized under these principles except where restricted or prohibited by law." (DAB Op. at 12 (quoting OMB Circular A-87, App. A, ¶ A.1) (emphasis added by the DAB).)

With respect to the DAB's conclusion that the HCBS waiver exclusion for room and board prevents reimbursement for joint costs covered by the waiver, Pennsylvania has failed to demonstrate that the DAB's analysis was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). Therefore, the Board's decision will not be overturned on this basis.

### ii.     Reimbursement of Multi-Use Facilities

Next, Pennsylvania argues that, because its community residential facilities are "multi-use" facilities, Pennsylvania should be reimbursed for the portion of services relating to habilitation. (Doc. No. 22 at 39.) Pennsylvania argues that it was arbitrary and capricious for the DAB to categorize the facilities at issue as room and board where a large percentage of the activities that occurred in the residential facilities were aimed at habilitation:

> In the Board's view, if space is used for room and board part of the time, it must be attributed entirely to room and board, and no portion of the occupancy cost may be attributed to waiver services provided in that space. . . . This one-sided perspective makes no sense. Under the Board's logic, the contrary determination could also be made, i.e., a portion of the occupancy costs for all the space is for services, and therefore all costs are for services. Such a determination would be unreasonable and contrary to the principles of OMB Circular A-87, just as the DAB's decision here is.

(Id.)

Pennsylvania's argument again misinterprets the decision made by the Board. Rather than finding all the costs at issue to be solely for "room and board," the DAB recognized that the costs at issue would often be used to further two different ends. However, in reading the exclusionary language in the HCBS waiver statute broadly, the Board held that such joint costs could not be reimbursed. The DAB appeared to be open to evidence that there may have been times when the space was used exclusively for habilitation services, but Pennsylvania failed to produce evidence "that any of the space at issue was used exclusively for habilitation or other eligible waiver services and did not [also] benefit the cost objective of providing room and board for the residents." (DAB Op. at 12-13 (emphasis removed).) As the DAB explained:

> The problem is that the evidence is insufficient to show, which, if any, of the costs served only the goal of providing services and not the goal of providing shelter. Moreover, since by definition "habilitation services" are designed to assist and instruct

> developmentally disabled individuals in activities of daily living, the
> settings in which the services are provided are likely to be living
> spaces, which the facility would have to have even if only room and
> board were being provided for these residents.

(DAB Op. at 13-14.)  Again, the Court finds that Pennsylvania has failed to show that the DAB's

decision was arbitrary or capricious.

### iii.    Consistency with Federal Objectives

Third, Pennsylvania argues that the DAB's decision conflicts with the non-discrimination

principles of the American Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and the decision

in Olmstead v. L.C., 527 U.S. 581 (1999), "that reasonable accommodations should be made in

order to provide services in the most integrated setting appropriate to the individual's needs."

(Doc. No. 22 at 42.)  In addition, Pennsylvania argues that CMS has ignored its obligations

under the President Bush's New Freedom Initiative to work in cooperation with the

Commonwealth to achieve the goals of the ADA. (See Doc. No. 22 at 42-43 (citing Exec. Order

No. 13217, 66 FR 33155 (June 18, 2001)).)  From Pennsylvania's perspective, forcing it to pay

all the facility costs at issue in the present case "cannot be reconciled with the congressional

directive that such [habilitation] services should be provided in the most integrated setting

possible." (Id. at 43.)

Because the Court finds that the DAB's interpretation of the exclusion of "room and

board" costs was not arbitrary or capricious, the Court is not persuaded by Pennsylvania's

argument.  As HHS recognizes in its brief, the reality in Pennsylvania may be that the demands

for services exceed available resources. (Doc. No. 29 at 14.)  However, the economic situation

facing Pennsylvania does not change the fact that Congress has explicitly disallowed "room and

board" costs under the HCBS waiver.  It is within the purview of Congress's power to enact a

policy in line with the one advocated by Pennsylvania.  Until it does, however, the Court must enforce the law as it is written and as it has reasonably been interpreted by the HHS Secretary.

### iv.    Level of Deference Given to DAB's Interpretation

Pennsylvania argues for the first time in its response brief that "[b]ecause much of defendants' argument is a litigation position, not a longstanding agency interpretation, it is entitled to no deference."[15]  (Doc. No. 27 at 12 (citing Appalachian States Low-Level Radioactive Waste Comm'n v. Pena, 126 F.3d 193, 198-99 (3d Cir. 1997)).)  Specifically, Pennsylvania states:

> While defendants attempt to characterize their arguments as based on the "Secretary's interpretation" of the statute, a number of these arguments are no more than a litigation position.  Defendants do not point to any prior guidance documents or cases in which the Secretary has taken the position that a State may not allocate costs of space that serves multiple purposes in order to segregate and exclude room board costs.

(Doc. No. 27 at 11.)  In a footnote, Pennsylvania appears to extend this argument to the decision of the DAB itself, as Pennsylvania states that "the Board is not a policy-making body, but is fully bound by the regulations and guidance promulgated by the [HHS] Secretary." (Id. at 8-9 n.5.)  Pennsylvania avers that the Board's "disregard of [State Medicaid Manual § 4442.3.B.15], and defendants' attempt to give the provision a meaning at odds with its explicit wording, do not constitute a policy decision of the Secretary to which this Court should defer." (Id.)

---

[15] The Court notes that it is generally not proper for a party to raise an argument for the first time in its reply brief. See Int'l Raw Materials, Ltd. v. Stauffer Chem. Co., 978 F.2d 1318, 1327 n.11 (3d Cir. 1992); see also Keeling v. Damiter, No. 4:CV-09-0147, 2010 WL 678091, at *2 (M.D. Pa. Feb. 24, 2010) (noting that it was "patently unfair to raise arguments for the first time in a reply brief").  However, because the procedural posture of this case is one in which the parties have cross-motioned for summary judgment, and because the appropriate level of deference is a central issue, the Court will address Pennsylvania's argument.

This effort by Pennsylvania to diminish the level of deference given to the DAB's decision fails. First, pursuant to its foregoing analysis, the Court disagrees with Pennsylvania's assessment that the DAB disregarded § 4442.3.B.15 or that it gave it a "meaning at odds with its explicit wording." Second, contrary to Pennsylvania's attempts to diminish the role of the DAB in interpreting HHS regulations, the Social Security Act provides that the "Board's decision . . . shall be the final decision of the Secretary . . . ." 42 U.S.C. § 1316(e)(2)(B). Therefore, the DAB decision is the type of agency policy, pronounced in an adjudication, which the APA states is deserving of the <u>Chevron</u> level of deference. <u>See</u> <u>Butler County Mem'l Hosp. v. Heckler</u>, 780 F.2d 352, 355 (3d Cir. 1985).[16]

## C.      Requirement to Submit Waiver Amendment

Pennsylvania's final argument that the DAB's decision was arbitrary and capricious is that the DAB erred in suggesting that Pennsylvania was required to submit a waiver agreement. (Doc. No. 22 at 44.) The Court agrees that if such facility costs were reimbursable outside the "room and board" exclusion, then no additional approval would be necessary. However, because the Court finds that the reading of the HCBS waiver statute by the DAB was not arbitrary or

---

[16] The Court notes that even if it agreed with Pennsylvania that the position taken by HHS was solely for litigation, <u>Chevron</u> deference would still likely be appropriate. "The Supreme Court has stated that presentation of an administrative interpretation 'in the form of a legal brief' does not 'make it unworthy of deference' in certain circumstances." <u>Robert Wood Johnson Univ. Hosp. v. Thompson</u>, 297 F.3d 273, 282 (3d Cir. 2002) (quoting <u>Auer v. Robbins</u>, 519 U.S. 452, 462 (1997)). Rather, <u>Chevron</u> deference is even more appropriate in cases that involve a complex and highly technical regulatory program, such as Medicaid, which requires the administrative agency to rely on its significant expertise and the exercise of judgment grounded in policy concerns. <u>Id.</u> (citations omitted). Indeed, while the <u>Pena</u> decision cited by Pennsylvania states that "[n]o deference is due an agency's litigation position," it also recognizes that where a statute is ambiguous, a court should afford the same treatment to the Secretary's litigation position that it would to a more formal agency interpretation. <u>See</u> 126 F.3d at 198-99.

25

capricious, the fact that it noted that Pennsylvania should have submitted a new waiver agreement does not alter the Court's analysis.

IV.    **CONCLUSION**

In the instant case, Pennsylvania has put forward what it believes to be the better reading of the HCBS waiver statute, but it has failed to demonstrate that the reading by the DAB was arbitrary or capricious.  Therefore, the Court will grant summary judgment in favor of Defendants and affirm the decision of the DAB.  An order consistent with this memorandum follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **COMMONWEALTH OF PENNSYLVANIA** | **:** | |
| **DEPARTMENT OF PUBLIC WELFARE,** | **:** | |
| | **:** | **Civil Action No. 1:08-CV-791** |
| **Plaintiff,** | **:** | |
| | **:** | **(Chief Judge Kane)** |
| **v.** | **:** | |
| | **:** | |
| **U.S. DEPARTMENT OF HEALTH AND** | **:** | |
| **HUMAN SERVICES, et al.,** | **:** | |
| | **:** | |
| **Defendants** | **:** | |

**ORDER**

**AND NOW**, on this 31st day of March 2010, in consideration of the parties' cross-motions for summary judgment, it is **HEREBY ORDERED** that Defendants' motion for summary judgment (Doc. No. 25) is **GRANTED**.  Accordingly, Plaintiff's motion for summary judgment (Doc. No. 21) is **DENIED**.  The Clerk of Court is directed to close this case.

S/ Yvette Kane
Yvette Kane, Chief Judge
United States District Court
Middle District of Pennsylvania
Dated: March 31, 2010